MICHAEL J. HADDAD (SBN 189114)
JULIA SHERWIN (SBN 189268)
TERESA ALLEN (SBN 264865)
BRIAN HAWKINSON (SBN 341856)
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, CA 94612
Telephone:    (510) 452-5500
Facsimile:    (510) 452-5510

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORDAN DEPPE, Deceased, by and through his Successor in Interest, MICHAEL DEPPE; and MICHAEL DEPPE, Individually, <br><br> Plaintiff, <br><br> vs. <br><br> SHASTA COUNTY, a public entity; SHASTA COUNTY SHERIFF-CORONER ERIC MAGRINI, in his individual capacity; CAPTAIN GENE RANDALL; WELLPATH INC., a Delaware corporation; WELLPATH MANAGEMENT, INC., a Delaware Corporation; WELLPATH LLC, a Delaware Limited Liability Company; CALIFORNIA FORENSIC MEDICAL GROUP, INC., a California Corporation; SANAZ PARSA, M.D.; TRACI LEWIS, L.M.F.T; SHEA PHINNEY, L.M.F.T.; DANIEL DELLWO, P.A.; and DOES 1–20; individually, jointly and severally, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL** |

Plaintiff, by and through his attorneys, HADDAD & SHERWIN LLP, for his Complaint against Defendants, states as follows:

## JURISDICTION

1.      This is a civil rights wrongful death/survival action arising from Defendants' deliberate indifference to the serious medical and mental health needs of pretrial detainee, JORDAN DEPPE, resulting in his suicide at Shasta County jail on January 7, 2021.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of California.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.  Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, to hear and decide claims arising under state law.

## INTRADISTRICT ASSIGNMENT

2.      A substantial part of the events and/or omissions complained of herein occurred in the City of Redding, Shasta County, California.  Pursuant to Eastern District of California Civil Local Rule 120(d), this action is properly assigned to the Sacramento Division of the United States District Court for the Eastern District of California.

## PARTIES AND PROCEDURE

3.      Plaintiff MICHAEL DEPPE is the father of Decedent JORDAN DEPPE and a resident of the State of California.  Plaintiff MICHAEL DEPPE brings these claims individually and as Successor in Interest for his son, Decedent JORDAN DEPPE, pursuant to California Code of Civil Procedure §§ 377.10 *et seq*., 377.60, and federal civil rights laws.  Decedent JORDAN DEPPE had no spouse or children.  A successor in interest declaration is filed herewith.

4.      Plaintiff brings these claims pursuant to California Code of Civil Procedure §§ 377.20 et seq. and 377.60 et seq., which provide for survival and wrongful death actions.  Plaintiff also brings these claims individually and on behalf of Decedent JORDAN DEPPE on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, federal and state civil rights law, and California law.  Plaintiff also brings these claims as a Private Attorney General, to vindicate not only his rights, but others' civil rights of great importance.

5.    Defendant SHASTA COUNTY ("COUNTY") is a public entity, duly organized and existing under the laws of the State of California.  Under its authority, the COUNTY operates the Shasta County Sheriff's Office (SCSO).

6.    Defendant SHERIFF-CORONER ERIC MAGRINI ("MAGRINI"), at all times mentioned herein, was employed by Defendant COUNTY as Sheriff-Coroner for the COUNTY, and was acting within the course and scope of that employment.  In that capacity, Defendant MAGRINI was a policy making official for the COUNTY OF SHASTA.  Further, Defendant MAGRINI was ultimately responsible for the provision of medical care to inmates at the COUNTY jail, including assessment of possible mental health needs, and all COUNTY policies, procedures, and training related thereto.  He is being sued in his individual capacity.

7.    Defendant CAPTAIN GENE RANDALL ("RANDALL"), at all times mentioned herein, was employed by Defendant COUNTY as Jail Commander and Captain of the Custody Division, including the jail, for the COUNTY, and was acting within the course and scope of that employment.  In that capacity, Defendant RANDALL was a policy making official for the COUNTY OF SHASTA.  Further, Defendant RANDALL was responsible for the general management and control of the Custody Division, with primary authority and responsibility for the operations, staff assignments, program development, personnel supervision and training, maintenance and auxiliary inmate services at the jail, subordinate only to the Sheriff and/or Undersheriff.  Further, on information and belief, Defendant MAGRINI had delegated certain responsibility for the provision of medical care to inmates at the COUNTY jail to Defendant RANDALL.

8.    Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH INC., WELLPATH MANAGEMENT, INC., and WELLPATH LLC (collectively here "WELLPATH"), were at all times herein mentioned alter-egos of each other, sharing money, resources, policies, practices, officers, directors, attorneys, and management, each organized under the laws of the State of Delaware or State of California and licensed to do business in California.  Defendant WELLPATH provided medical, mental health, and nursing care to pretrial and post-conviction detainees and inmates in Shasta County Jail and Juvenile Hall, pursuant to a contract with the COUNTY OF SHASTA.  On information and belief, WELLPATH and their employees

and agents are responsible for making and enforcing policies, procedures, supervision, and training related to the medical care of inmates and detainees in Defendant COUNTY OF SHASTA's jails, including but not limited to assessment of inmate-patients for mental health and emergency medical needs, sending patients for emergency medical care and mental health care, and providing suicide prevention precautions.  On information and belief, WELLPATH and its employees and agents are and were at all material times responsible for making and executing policies, procedures, supervision, and training related to the medical care and/or mental health care of detainees and inmates in the COUNTY OF SHASTA jails, including, but not limited to, properly assessing and classifying inmates, properly sending inmates for emergency medical and mental health care, properly assessing and addressing the mental health needs of inmates, properly assessing and treating the serious medical and mental health needs of inmates, including suicide prevention, observation of suicidal and potentially suicidal inmates, mental illness, and emotional disturbance. Defendants SANAZ PARSA, M.D., TRACY LEWIS, L.M.F.T., SHEA PHINNEY, L.M.F.T, DANIEL DELLWO, P.A, as well as certain DOE DEFENDANTS including, but not limited to, WELLPATH employees and agents acting within the course and scope of their employment with WELLPATH (and within the course and scope of their employment by COUNTY by virtue of WELLPATH's contract with COUNTY) -- were all responsible for properly assessing and addressing the medical needs of inmates, properly assessing and addressing the mental health needs of inmates, properly assessing and treating the serious medical needs of inmates, providing appropriate observation and a treatment plan for serious medical needs, including suicide prevention, care and treatment for mental illness and emotional disturbance, monitoring inmates, and summoning emergency medical care when it was needed.

9.      Defendant SANAZ PARSA, M.D., at all times mentioned herein, was employed by Defendant WELLPATH as a psychiatrist, and was acting within the course and scope of that employment.  As set forth below, Defendant PARSA knew of MR. DEPPE's serious psychiatric needs, yet never went to the jail to assess him, never requested appropriate suicide precautions for MR. DEPPE, including heightened monitoring and observations of him, never created a treatment plan for MR. DEPPE, failed to provide reasonable accommodations for MR. DEPPE's disabilities,

and failed to supervise the inadequate mental health care provided to MR. DEPPE, among other failures, all with deliberate indifference to MR. DEPPE's serious mental health needs.

10.     Defendant TRACY LEWIS, L.M.F.T., was at all material times employed by Defendant WELLPATH as a Licensed Marriage and Family Therapist, and acted within the course and scope of that employment.  As set forth below, Defendant LEWIS failed to properly assess and address MR. DEPPE's serious mental health needs, failed to request appropriate suicide precautions for MR. DEPPE in, and following his discharge from, the safety cell, failed to institute heightened monitoring and observations of MR. DEPPE, failed to create a treatment plan for MR. DEPPE, and failed to provide reasonable accommodations for MR. DEPPE's disabilities, among other failures, all with deliberate indifference to MR. DEPPE's serious mental health needs.

11.     Defendant SHEA PHINNEY, L.M.F.T., was at all material times employed by Defendant WELLPATH as a Licensed Marriage and Family Therapist, and acted within the course and scope of that employment.  As set forth below, Defendant PHINNEY failed to properly assess and address MR. DEPPE's serious mental health needs, failed to request appropriate suicide precautions for MR. DEPPE in, and following his discharge from, the safety cell, failed to institute heightened monitoring and observations of MR. DEPPE, failed to create a treatment plan for MR. DEPPE, and failed to provide reasonable accommodations for MR. DEPPE's disabilities, among other failures, all with deliberate indifference to MR. DEPPE's serious mental health needs.

12.     Defendant DANIEL DELLWO, P.A., was at all material times employed by Defendant WELLPATH as a Physician's Assistant and acted within the course and scope of that employment.  Defendant DELLWO failed to properly assess and address MR. DEPPE's serious mental health needs, failed to request appropriate suicide precautions for MR. DEPPE, including heightened monitoring and observations of MR. DEPPE, failed to create a treatment plan for MR. DEPPE, and failed to provide reasonable accommodations for MR. DEPPE's disabilities, among other failures, all with deliberate indifference to MR. DEPPE's serious mental health needs.

13.     Defendants DOES 1-20 ("DOE Defendants"), at all times mentioned herein, were employed by Defendants COUNTY or WELLPATH as correctional deputies, sergeants, supervisors, health care personnel, mental health care personnel, or other policy making officials at

the jail, and were acting within the course and scope of that employment.  DOE Defendants are being sued in their individual capacities.

14.    Plaintiff is ignorant of the true names and capacities of Defendants DOES 1-20 and therefore sue these Defendants by such fictitious names.  Despite Plaintiff's multiple and lawful requests for MR. DEPPE's complete jail custody records, including observation logs, incident reports, and other pertinent records, Defendant COUNTY has refused to produce them.  Plaintiff is informed and believes and thereon alleges that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiff as set forth herein.  Plaintiff will amend his complaint to state the names and capacities of each DOE DEFENDANT when they have been ascertained.

15.    Plaintiff is informed and believes and thereon alleges that each of the Defendants were at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship.  Plaintiff is further informed and believes and thereon alleges that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter specifically alleged.  At all material times, each Defendant was jointly engaged in tortious activity and an integral participant in the conduct described herein, resulting in the deprivation of Plaintiff's and Decedent's constitutional rights and other harm.

16.    At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California and Shasta County.

17.    Plaintiff timely and properly filed a tort claim with Shasta County pursuant to California Government Code sections 910 et seq., and this action is timely filed within all applicable statutes of limitation.

18.    This complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

## GENERAL ALLEGATIONS

19.    Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

20.     JORDAN DEPPE was a 25-year-old military veteran with a significant history of severe mental illnesses, including schizophrenia or schizoaffective disorder, major depression, and multiple suicide attempts, including at Shasta County jail.  With appropriate medication, MR. DEPPE enjoyed life's activities, such as snowboarding, hiking, and football, and had close relationships with his father, step-mother, and other family members.



21.     On or about December 21, 2020, in the City of Redding, Shasta County, Redding police officers arrested MR. DEPPE for allegedly brandishing a kitchen knife and acting erratically while waiting in line for free food given out to homeless people.  MR. DEPPE told the police officers that he thought people were being stabbed so he grabbed a bread knife from a table to protect himself, and removed the eyeglasses from a man he thought was his father.  Due to his deteriorating mental health, MR. DEPPE was homeless at the time of his arrest and had been experimenting with methamphetamine.  The circumstances surrounding MR. DEPPE's arrest indicated that he was exhibiting delusional behavior and clearly suffering from a severe mental illness.  Nonetheless, MR. DEPPE was arrested and transported to Shasta County jail.

22.     At all times throughout his incarceration at Shasta County jail, it was obvious that MR. DEPPE was severely mentally ill.  MR. DEPPE's mental illness was well known by Defendants from his prior incarcerations at the jail and from a Welfare & Institutions Code § 5150 psychiatric hold at Restpadd Psychiatric Care Facility ("Restpadd") in Shasta County for engaging

in suicidal conduct and ideation.  MR. DEPPE's medical and mental health records from Restpadd were obtained by Defendants during a previous incarceration, and at all material times, continued to be accessible to Defendants.

23.    In the days and weeks leading up to his arrest, and throughout the year, MR. DEPPE was arrested by local law enforcement officers at least seven times, usually for minor misdemeanor violations, and incarcerated at Shasta County jail where he would typically be booked, placed in a holding or sobering cell, and released the following day.  All Defendants, including jail custody, medical, and mental health staff knew or should have known that MR. DEPPE was severely mentally ill and had many prior suicide attempts, including at Shasta County jail, had immediate and serious mental health needs upon arrival at the jail and thereafter, and was at grave risk of suicide.

24.    Earlier in the year, on March 23, 2020, MR. DEPPE was arrested for battery and incarcerated at Shasta County jail after he resisted being physically removed from Shasta Regional Medical Center.  On April 2, 2020, COUNTY deputies heard banging noises coming from MR. DEPPE's cell, and discovered a broken safety razor in his cell.  MR. DEPPE told COUNTY deputies that he "tried to hang himself but stopped because it hurt too much."  COUNTY deputies moved MR. DEPPE to a safety cell.  Defendant TRACI LEWIS, L.M.F.T. ("LEWIS") evaluated MR. DEPPE and reported that he had a history of suicidal behaviors, including within the past three months.  MR. DEPPE also told WELLPATH Licensed Vocational Nurse, Jennifer Reasoner, that he had mental health issues and had been hospitalized at Restpadd.  That same day, MR. DEPPE had a telepsychiatry consultation with WELLPATH psychiatrist, Stancil Johnson, M.D., who noted that MR. DEPPE was diagnosed with borderline personality disorder and that MR. DEPPE told Dr. Johnson that he had been hospitalized at Restpadd.  WELLPATH Defendant DANIEL DELLWO, P.A. ("DELLWO") requested and received MR. DEPPE's medical and mental health records from Restpadd that same day.

25.    MR. DEPPE's Restpadd records revealed that on January 28, 2020, MR. DEPPE went to Mercy Medical Center and proclaimed, "I just want to kill myself.  I'd use a gun if I had

one, but can't get one."  He was admitted to Restpadd for a Welfare & Institutions Code § 5150 psychiatric hold for being a danger to himself.  The mental health staff at Restpadd reported: "Mr. Deppe needs acute, inpatient care.  Mr. Deppe is suicidal with a history of previous suicide attempts and he needs monitoring for safety."  The Restpadd records also documented that MR. DEPPE received services from several mental health care facilities, including Shasta County Mental Health, had previous suicide attempts, and a family history of suicide, including at the age of ten finding his eighteen-year-old brother hanging in a closet.

26.     During MR. DEPPE's April 2020 incarceration, Defendants failed to request any of MR. DEPPE's medical and mental health care records from the other psychiatric facilities where he received care.  Defendant LEWIS discharged MR. DEPPE from the safety cell after one day, and he was released from jail the following week, on April 8, 2020.

27.     MR. DEPPE was also briefly incarcerated at Shasta County jail for minor misdemeanor violations on October 23, 2020 and again on November 1, 2020, and released the following day on each occasion.  During MR. DEPPE's incarcerations on December 16, 2020, and again on December 18, 2020, the COUNTY intake deputies and WELLPATH Registered Nurses (RNs) and Licensed Vocational Nurses (LVNs) completed medical pre-screening and receiving forms and noted that MR. DEPPE was suicidal and had multiple past suicide attempts, including by hanging and by jumping in front of cars, and that he was diagnosed with mental health illnesses. MR. DEPPE was released from jail the next day following both of these incarcerations.

28.     Upon his arrival at Shasta County jail on December 21, 2020, all Defendants, including jail custody, medical, and mental health staff, knew or should have known that MR. DEPPE was severely mentally ill and required appropriate suicide precautions, including heightened monitoring and observations for his safety.

29.     During the booking process on December 21, 2020, COUNTY Deputy Smotski completed a medical pre-screening questionnaire and marked on the form that MR. DEPPE did not appear to be suicidal and that MR. DEPPE informed him he never had thoughts of suicide.  Had Deputy Smotski reviewed MR. DEPPE's prior medical pre-screening and receiving screening

assessment forms from just three days earlier, he would have known that MR. DEPPE required immediate psychiatric care, increased monitoring, and was at grave risk of suicide.  Per WELLPATH's Suicide Prevention policy, WELLPATH's medical or mental health care staff are to perform focused screening at intake to identify potentially suicidal patients.  WELLPATH staff failed to assess MR. DEPPE at all during intake despite, on information and belief, obvious signs that he was suffering from a mental health crisis, and failed to complete WELLPATH's required 12-page Receiving Screening medical and mental health assessment form.  Without the required screening to assess and address MR. DEPPE's potential suicidality and mental health needs, MR. DEPPE was admitted into the jail and housed in a general population cell with a bunk bed and items that could be used for self-harm, rather than a safety cell for his own protection.

30.    By December 24, 2020, notwithstanding his long history of severe mental illnesses and repeated suicide attempts, MR. DEPPE received no mental health treatment or assessments whatsoever.  That day, MR. DEPPE's cellmate informed COUNTY Deputy Serda that MR. DEPPE had been choking himself with his shirt.  MR. DEPPE's cellmate later told investigators that he witnessed MR. DEPPE choking himself with a towel between 50 and 100 times during a one-day period and that MR. DEPPE exhibited odd behavior such as yelling for his father, pacing back and forth in his cell, and calling out for Jesus.  MR. DEPPE confirmed to COUNTY deputies that he had been trying to hang himself and that, "nobody was doing anything for him."  MR. DEPPE also had six scratches on his left arm from a spork.  When asked by COUNTY Deputies if he wanted to die, MR. DEPPE responded, "I want to see God immediately."  COUNTY DOE Defendants conducting routine welfare checks per Shasta County policy, should have known and documented MR. DEPPE's odd behavior and repeated attempts to choke himself.

31.    COUNTY DOE Defendants then transferred MR. DEPPE to a safety cell.  On information and belief, Defendant WELLPATH's Suicide Prevention policy, required that MR. DEPPE be placed on constant observation.  The requirement of constant, 24-hour, seven days a week observation for inmate-patients who are acutely at risk of suicide is also a nationally generally accepted standard.  However, Defendant COUNTY has refused to provide any cells within its nine-

floor jail where patients can receive the required constant observation.  Wellpath's Suicide Prevention policy required MR. DEPPE to be transferred to an inpatient facility or hospital for his safety when WELLPATH Defendants knew they were not going to provide the required constant observation.  In addition, Defendants COUNTY, MAGRINI, and RANDALL knowingly allow their employees to cover cell windows with magnets which preclude patients from being observed through them.  The covering of cell windows with magnetic cardboard sheets happens so frequently, openly, and obviously at the jail that it would have been impossible for Defendants MAGRINI and RANDALL not to know about it.  Furthermore, on information and belief, COUNTY DOE Defendants failed to conduct two intermittent checks every half hour to document MR. DEPPE's condition as required by the COUNTY's safety cell policy.

32.    On December 24, 2021 at approximately 2:21 p.m., Defendant LEWIS assessed MR. DEPPE in the safety cell and noted that MR. DEPPE told her he tried to commit suicide in the past, including while previously incarcerated, had been hospitalized at Restpadd, and had been prescribed antipsychotic medication while at Restpadd.  Defendant LEWIS, who had previously assessed MR. DEPPE in the safety cell following his April 2020 suicide attempt, further noted that MR. DEPPE told her, "I like to make a 'u' around my neck like with a towel and hang my arms from the towel.  Doesn't everyone do that?"  Despite knowing of MR. DEPPE's past suicide history and psychiatric hospitalizations, Defendant LEWIS failed to properly assess and address MR. DEPPE's mental health needs, failed to request his updated mental health records from Restpadd as Defendant DELLWO did when MR. DEPPE previously attempted suicide at Shasta County jail in April 2020, and per WELLPATH's policy requiring review of a patient's health record to ascertain a history of mental conditions, failed to request or institute any increased observation of MR. DEPPE while he was housed in the safety cell, failed to create a treatment plan for MR. DEPPE, failed to provide reasonable accommodations for MR. DEPPE's disabilities, failed to request that a physician, psychiatrist, psychologist, or mid-level provider assess MR. DEPPE's psychiatric condition, and failed to request a medication consultation, all in deliberate indifference to MR. DEPPE's serious psychiatric needs.

33.    Had Defendant LEWIS requested MR. DEPPE's updated Restpadd medical and mental health care records, she would have learned that MR. DEPPE was placed on Welfare & Institutions Code § 5150 and § 5250 psychiatric holds at Restpadd in April and May of 2020 for being a danger to himself after reporting suicide attempts.  On information and belief, Defendant DELLWO also worked at Restpadd during May 2020 and assessed MR. DEPPE during his stay.

34.    Later that night at approximately 8:48 p.m., Kassandra Gamsby, L.V.N. ("GAMSBY") evaluated MR. DEPPE in the safety cell and noted that when jail custody staff asked MR. DEPPE if he wanted to die, he responded, "I want to see God immediately."  LVN Gamsby also noted that MR. DEPPE was recently hospitalized at Restpadd.  LVN Gamsby called Defendant LEWIS following her evaluation of MR. DEPPE, and on information and belief, informed Defendant LEWIS of her findings.  Again, Defendant LEWIS failed to request MR. DEPPE's mental health records from Restpadd, failed to request or institute any increased observation of MR. DEPPE while he was in the safety cell, failed to create a treatment plan for MR. DEPPE, failed to provide reasonable accommodations for MR. DEPPE's disabilities, failed to request that a physician, psychiatrist, psychologist or mid-level provider assess MR. DEPPE's medical and psychiatric condition, and failed to request a medication consultation, all in deliberate indifference to his serious psychiatric needs.

35.    On December 25, 2020, Defendant SHEA PHINNEY, L.M.F.T. ("PHINNEY") assessed MR. DEPPE in the safety cell.  Defendant PHINNEY reported that MR. DEPPE previously attempted suicide, that he exhibited hallucinatory and delusional behavior as he spoke about wanting to see God and to be closer to God, and made nonsensical remarks about a knife turning into a cop car.  Defendant PHINNEY further reported that MR. DEPPE exhibited poor judgment and insight, that he appeared impulsive, irritable, and aggressive, and that he was previously prescribed antipsychotic medication.  Defendant PHINNEY failed to request or institute any increased observation of MR. DEPPE while he was in the safety cell, failed to create a treatment plan for MR. DEPPE, failed to provide reasonable accommodations for MR. DEPPE's disabilities, failed to request that a physician, psychiatrist, psychologist, or mid-level provider assess MR. DEPPE's psychiatric condition, and failed to request a medication consultation.

Defendant PHINNEY simply planned to follow up once a day, with no further action taken to assess and address MR. DEPPE's deteriorating mental health, all in deliberate indifference to his serious psychiatric needs.

36.    The next day, on December 26, 2020, Defendant LEWIS assessed MR. DEPPE in the safety cell again and noted that he was not cooperative during the assessment and refused to answer most questions.  Defendant LEWIS finally referred MR. DEPPE to a physician for a prescription evaluation, but not for the next available physician visit nor for any urgent physician or psychiatrist visit.

37.    On December 27, 2020, Defendant LEWIS conducted another safety cell assessment and noted that MR. DEPPE continued to exhibit signs and symptoms of severe mental illness, including hallucinations and delusional statements, such as, "Mushrooms make me see better.  You know, like through my third eye, not these other two.  I went into the military because I always thought I was the horse in the movie Spirit, and I would come back and find my Indian boy," and suicidal ideation, such as, "You really don't know if I will try to choke myself again.  I'm kind of a gamble that way."   MR. DEPPE also stated, "I'm having a pretty good day today, but that can change in an instant…really nothing to keep me going at this point."  Again, Defendant LEWIS failed to request or institute any heightened monitoring and observations of MR. DEPPE, failed to create a treatment plan for MR. DEPPE, failed to provide reasonable accommodations for MR. DEPPE's disabilities, and failed to follow up on her referral for MR. DEPPE to be seen by a physician for a medication consultation, all with deliberate indifference to his serious psychiatric needs.

38.    On December 29, 2021, Defendant DELLWO conducted a medical sick call on MR. DEPPE while he was housed in the safety cell.  Defendant DELLWO noted that MR. DEPPE was medically stable but had an "odd presentation," and prescribed him antipsychotic medication for anxiety.  Defendant DELLWO took no steps to ensure that MR. DEPPE took the psychiatric medication prescribed, failed to create a treatment plan for MR. DEPPE, failed to request appropriate suicide precautions for MR. DEPPE, including heightened monitoring and observations

of MR. DEPPE, failed to provide reasonable accommodations for MR. DEPPE's disabilities, failed to request a psychiatric evaluation of MR. DEPPE, and failed to request MR. DEPPE's mental health records from Restpadd and other Shasta County psychiatric care facilities, as he previously did during MR. DEPPE's past incarceration in April 2020, all in deliberate indifference to MR. DEPPE's serious psychiatric needs.

39.    Defendant LEWIS continued to assess MR. DEPPE in the safety cell once a day. Despite MR. DEPPE's extensive history of serious mental health illnesses, prior hospitalizations, past suicide attempts, and prescribed antipsychotic medications, Defendant LEWIS discharged MR. DEPPE from the safety cell on December 30, 2020, without MR. DEPPE showing any significant signs of improved mental health, without any measures taken for continuity of care, with no request for heightened monitoring, and no treatment plan whatsoever, even though she knew he was at grave risk of suicide and had actively engaged in suicidal self-harm just days before.  On information and belief, MR. DEPPE was then housed alone in segregated cell 3C04, essentially in solitary confinement, with a bunk bed and items that he could use to harm himself.  On information and belief, inmates suffering from severe mental illnesses are not adequately monitored in the segregated housing unit and do not receive the level of psychiatric care needed to treat their mental illness.  It has been well known in correctional health care for decades that housing a severely mentally ill inmate alone in segregation endangers the patient's mental health and greatly increases the risk of further morbidity and suicide.  Further, it is generally accepted throughout correctional health care that inmates at risk of suicide who are housed alone in segregated cells must be under constant observation.

40.    COUNTY deputies are required to regularly conduct "welfare checks" on inmates housed in segregated housing and are required to document the inmate's condition.  On information and belief, the COUNTY permits deputies to record "welfare checks" on inmates by utilizing a "PIPE" device that they can swipe against a sensor on the wall outside the cell without ever observing the inmate.  Despite a written policy requiring the inmate's condition to be documented, as a matter of custom and practice, and unwritten policy, the COUNTY does not require deputies to

provide the direct visual observation and documentation of that observation that California law requires.  Deputies at Shasta County jail also openly and frequently use large white magnets to cover cell door windows, further preventing inmates from being directly observed during welfare checks and further isolating the inmates.  On information and belief, COUNTY DOE Defendants persistently failed to provide MR. DEPPE with the required observations to keep him safe.

41.    On December 31, 2020, MR. DEPPE had a telepsychiatry consultation with WELLPATH psychiatrist, Defendant SANAZ PARSA, M.D. ("PARSA").   Defendant PARSA reported that MR. DEPPE had a history of choking himself to get high and of § 5150 psychiatric holds, and that he told her he choked himself "just because I was homeless and had nowhere to go." MR. DEPPE also told Defendant PARSA that he chokes himself because he likes the feeling and he starts hearing God and can communicate with him in that state.  MR. DEPPE further reported that he had anxiety and that he did not sleep the night before.  Defendant PARSA knew of MR. DEPPE's serious psychiatric needs, yet failed to go to the jail to assess him, failed to request appropriate suicide precautions for MR. DEPPE, including heightened monitoring and observations of him, failed to require that he be given suicide-resistant housing and clothing, failed to require that he be provided the necessary constant observation to protect him from suicide or self-harm, failed to create a treatment plan for MR. DEPPE, failed to provide reasonable accommodations for MR. DEPPE's disabilities, failed to supervise the inadequate mental health care provided to MR. DEPPE, and failed to request MR. DEPPE's mental health records from Restpadd and other Shasta County psychiatric health facilities, all with deliberate indifference to MR. DEPPE's serious psychiatric needs.  Instead, Defendant PARSA instructed MR. DEPPE to continue on the antipsychotic medication she made no effort to ensure he was taking, and planned to follow up in one to two weeks.

42.    On January 4, 2020, Defendant LEWIS conducted a mental health sick call on MR. DEPPE and noted that he had been "cheeking," or pretending to swallow his medication, for the last two days, and that MR. DEPPE continued to have rapid speech, with poor insight and judgment. Defendant LEWIS noted that MR. DEPPE was at a moderate risk for self-harm, but did nothing to

ensure he took his prescribed medication, failed to request any psychiatric evaluation or medication assessment, failed to request or institute any heightened monitoring and observations of him, failed to create a treatment plan for MR. DEPPE, and failed to provide reasonable accommodations for MR. DEPPE's disabilities.  On information and belief, MR. DEPPE continued to be housed in a cell with a bunk bed and items that could be used for self-harm, rather than a safety cell, and he was provided no closer monitoring or suicide precautions.

43.    On January 5, 2021, Defendant LEWIS conducted another mental health assessment on MR. DEPPE while he was housed in solitary confinement.  MR. DEPPE informed her that he had been hospitalized for psychiatric treatment "many times."  When asked whether he had any prior suicide attempts, MR. DEPPE, responded, "Many times.  I guess like five times I have tried.  I tried to choke myself to death.  I thought if you were to hang yourself, one or two things would happen.  I would be in darkness forever or a light would come on and I would be God."  MR. DEPPE also informed Defendant LEWIS that he had a family history of suicide, which Defendant LEWIS knew or should have known is a factor that significantly increases the risk of suicide. Defendant LEWIS further reported that MR. DEPPE exhibited symptoms of psychosis and depression and that he appeared to be diagnosed with a psychotic and a mood disorder.  Defendant LEWIS further noted that MR. DEPPE was talking to someone who was not present and whispering and smiling to his right shoulder as she assessed him, and that he appeared delusional, had poor insight, impulsive behavior, and that his hair was standing straight up and his clothes were dirty and on backwards.  It should have been obvious to Defendant LEWIS that MR. DEPPE's mental health was rapidly deteriorating, yet Defendant LEWIS never requested another psychiatric evaluation of MR. DEPPE, even though she knew he was "cheeking" his medication, never created a treatment plan for MR. DEPPE, never requested or instituted necessary suicide precautions for him, including heightened monitoring and observations of him, and failed to provide reasonable accommodations for MR. DEPPE's disabilities, all with deliberate indifference to MR. DEPPE's serious psychiatric needs.

44.    On January 6, 2021, MR. DEPPE's criminal case was called and he appeared in Shasta County Superior Court.  MR. DEPPE waived his right to counsel, on information and belief due to his mental health illness, and the judge relieved his public defender of his duties.  MR. DEPPE represented himself during the hearing.  The matter was continued to the next day.

45.    After days of clear and serious deterioration in MR. DEPPE's mental health, combined with Defendants' deliberately indifferent lack of treatment and refusal to provide necessary constant observation to protect MR. DEPPE, MR. DEPPE committed suicide in solitary confinement.  On January 7, 2021, at approximately 9:04 a.m., COUNTY deputies Austin Dunham and Derek Page found MR. DEPPE sitting on the floor of his cell with his back up against his bunk bed and his jail-issued pants wrapped around his neck and tied to the bed post.  Deputy Page reported that it appeared MR. DEPPE rolled his body in a circular motion to twist the pants tighter around his neck.  In addition to Defendants' persistent refusal to provide constant observation for acutely suicidal inmates, on information and belief, COUNTY DOE Defendants had not been conducting timely, direct visual observations of MR. DEPPE per Shasta County policy.  Life-saving measures were administered and a faint pulse was found.  MR. DEPPE was transported to Shasta Regional Medical Center and then transferred to Mercy Medical Center for a higher level of care.  MR. DEPPE was placed on comfort care at Mercy Medical Center and died the next morning.  According to the official Shasta County autopsy report, MR. DEPPE's cause of death was "complications from hanging."

46.    JORDAN DEPPE's death in custody was one of at least 5 reported by the Shasta County Jail in 2021 alone.  25 deaths occurred in the Shasta County jail between 2006 and 2020, as reported in a June 24, 2020, article[1] in Redding's Record Searchlight entitled, "Dying Inside: Why Are More Deaths Happening in Shasta County Jail Custody?"  Shasta County ranks second in total deaths among California's 10 county jail systems with 10,000 to 18,000 annual bookings, based on

---

[1] https://www.redding.com/in-depth/news/local/2020/06/24/shasta-county-jail-california-inmate-deaths-mental-health-services/5281201002/

State data from 2005-2018.  Defendant RANDALL acknowledged that some deaths in custody are ultimately preventable, responding, "There's no question about it."

47.    WELLPATH holds itself and its officers, directors, and managing agents out as experts in the field of correctional health care.  WELLPATH is the largest for-profit correctional health care provider in the United States, with contracts covering in excess of 550 jails, prisons, and behavioral health facilities in 36 states.

48.    Yet, CALIFORNIA FORENSIC MEDICAL GROUP, INC.  ("CFMG"), which was part of the Correctional Medical Group Companies that merged with Correct Care Solutions in 2018 to form WELLPATH and ran all of the companies' services in the State of California, has been criticized for its persistent inadequate health care provided to inmates throughout the State of California.  A January 17, 2015, article[2] in the *Sacramento Bee* entitled, "California for-Profit Company Faces Allegations of Inadequate Inmate Care," reported that CFMG's population-adjusted rate of suicide or drug overdose deaths in custody is 50% higher than non-CFMG counties.  In a 10-year period ending in May 2014, 92 people died of suicide or a drug overdose while in the custody of a jail served by CFMG.

49.    A July 13, 2020, article[3] in the *Atlantic* entitled, "Private Equity's Grip on Jail Health Care" reported that correctional care is good business, especially as more counties have moved to privatize.  WELLPATH currently serves about 10 percent of the counties in the nation. WELLPATH is expected to enjoy at least $1.5 billion in revenue every year.  WELLPATH and its predecessor companies' contracts with the COUNTY require WELLPATH to pay for all outside or hospital care for inmates up to $25,000, which creates a disincentive for WELLPATH and its employees to send patients off-site for emergency care or necessary inpatient psychiatric care.

50.    All COUNTY and WELLPATH employed Defendants had actual knowledge that MR. DEPPE was suffering from serious psychiatric needs, and all Defendants denied MR. DEPPE necessary medical and/or psychiatric care, including necessary emergency care.  Defendants

---

[2] (https://www.sacbee.com/news/investigations/the-public-eye/article7249637.html)

[3] file:///C:/Users/resaf/Downloads/Private%20Equity's%20Grip%20on%20Jail%20Health%20Care%20-%20The%20Atlantic.pdf

1  deliberately disregarded MR. DEPPE's safety and medical/psychiatric needs in their housing

2  placement, assessment, custody, observation, and care decisions.  On information and belief, due to

3  such deliberate indifference, MR. DEPPE's medical/psychiatric condition deteriorated and

4  Defendants allowed him to commit suicide.

5       51.    Defendants PARSA, LEWIS, PHINNEY, DELLWO, and DOES 1-20 knew and/or

6  must have known that MR. DEPPE had serious medical and psychiatric needs requiring emergency

7  treatment, care, and hospitalization, and that with deliberate indifference to such needs, these

8  Defendants, and/or DOES 1-20 caused MR. DEPPE to be deprived of such necessary, life-saving

9  medical and psychiatric care.

10      52.    On information and belief, Defendants SHERIFF-CORONER ERIC MAGRINI and

11 Jail Captain GENE RANDALL were each regularly briefed about inmates like JORDAN DEPPE

12 who had serious mental or behavioral health problems, and were informed throughout MR.

13 DEPPE's jail incarceration, and had personal knowledge of his intake and booking documentation,

14 all of his medical and psychiatric events, all disturbances involving him, all safety cell placements,

15 and all disciplinary measures taken against him.  Defendants MAGRINI and RANDALL knew

16 and/or must have known that MR. DEPPE had serious medical and psychiatric needs requiring

17 emergency treatment, care, and hospitalization, and that with deliberate indifference to such needs,

18 they caused MR. DEPPE to be deprived of such necessary, life-saving medical and psychiatric care.

19 Further, Defendants MAGRINI and RANDALL had actual knowledge of all jail customs and

20 practices described herein, including but not limited to the use of magnets over cell windows to

21 obscure observations of inmates and increase inmates' isolation, and the systematic failure to

22 require written documentation of visual observations and inmate-patients' condition during PIPE

23 cell checks, all as a matter of routine cover-up and code of silence.  Further, Defendants MAGRINI

24 and RANDALL were ultimately responsible for all customs, practices, policies, procedures,

25 training, supervision, and investigation at the jail, with direct oversight, command, and personal

26 knowledge in all of those areas.  Defendants MAGRINI and RANDALL were personally aware of

27 MR. DEPPE and his problems at their jail throughout his incarceration, and of their staffs'

28

deliberate indifference to MR. DEPPE's rights and safety throughout his incarceration.
Furthermore, Defendants MAGRINI and RANDALL were fully aware of the requirement that they
provide acutely suicidal inmates with constant, direct visual observation 24 hours a day, seven days
a week, and perpetuated the COUNTY's refusal to provide such observation, and refusal to have
any cells whatsoever in all nine floors of the jail where such constant observation could occur.

53.     All Defendants, including currently unidentified deputies, jail administrators, mental
health personnel, and/or law enforcement officers (DOES), knew or had reason to know that MR.
DEPPE was suffering from serious psychiatric illness, had serious psychiatric needs, and
consistently at a high risk of suicide, and all Defendants were deliberately indifferent to those
serious psychiatric needs, and denied MR. DEPPE necessary psychiatric care and reasonable
accommodations for his mental disability.  All Defendants, including currently unidentified
deputies, jail administrators, mental health personnel, and/or law enforcement officers (DOES),
were deliberately indifferent to MR. DEPPE's safety and psychiatric needs in their jail placement,
monitoring, assessment, custody, and care decisions.  Due to such deliberate indifference, MR.
DEPPE's psychiatric condition deteriorated and he committed suicide.

54.     Decedent's death was proximately caused by the individual COUNTY DOE
Defendants' deliberate indifference to Decedent's rights, safety and well-being as set forth above.
Decedents' death was also proximately caused by WELLPATH Defendants PARSA, LEWIS,
PHINNEY, DELLWO, and DOE Defendants' deliberate indifference to MR. DEPPE's rights,
safety, and serious medical and psychiatric needs, as set forth above.  Decedent's death was also
proximately caused by Defendants COUNTY, WELLPATH, MAGRINI, and RANDALL's
deliberate indifference to MR. DEPPE's rights, safety, and serious medical and psychiatric needs, as
set forth above.

55.     JORDAN DEPPE's death also was proximately caused by Defendant COUNTY's
failure to reasonably train and supervise jail deputies who were required to observe, monitor, and
protect MR. DEPPE.  These substantial failures reflect Defendant COUNTY's policies implicitly or
directly ratifying and/or authorizing deliberate indifference to serious medical and mental health

1   needs and the failure to reasonably train, instruct, monitor, supervise, investigate, and discipline

2   deputies employed by Defendants COUNTY and MAGRINI in deliberate indifference to inmates'

3   serious medical and mental health needs.

4        56.    Decedent's death also was proximately caused by Defendant WELLPATH's failure

5   to reasonably staff, train, supervise, and equip their medical and mental health care staff in the

6   proper and reasonable screening, assessment, and care of mentally ill or emotionally disturbed

7   inmates or inmates needing emergency medical treatment; failure to implement and enforce

8   generally accepted, lawful policies and procedures at the jail; and deliberate indifference to the

9   serious medical/psychiatric needs of inmates such as JORDAN DEPPE.  These substantial failures

10   reflect Defendant WELLPATH's policies implicitly ratifying and/or authorizing the deliberate

11   indifference to serious medical and mental health needs by their medical and mental health care

12   staff and the failure to reasonably train, instruct, monitor, supervise, investigate, and discipline

13   medical and mental health care staff employed by Defendants.

14        57.    In addition, Defendants COUNTY and WELLPATH contracted for WELLPATH to

15   provide inadequate staffing and mental healthcare.  At the time of JORDAN DEPPE's incarceration

16   at the SHASTA COUNTY jail, the average daily population in the Main Jail in December 2020 was

17   393 and the average daily population of the Main Jail in January 2021 was 388.  Defendants

18   contracted for only 8 hours per week of psychiatric care at the Main Jail and Shasta County's Adult

19   Rehabilitation Center (ARC).  Defendants' inadequate staffing contractual decisions precluded them

20   from providing constitutionally adequate mental healthcare for their inmate-patients.

21        58.    At all material times, and alternatively, the actions and omissions of each Defendant

22   were intentional, wanton, and/or willful, conscience-shocking, reckless, malicious, deliberately

23   indifferent to Decedent's and Plaintiff's rights, done with actual malice, grossly negligent,

24   negligent, and objectively unreasonable.

25        59.    As a direct and proximate result of each Defendant's acts and/or omissions as set

26   forth above, to the extent permitted and pled by the various legal claims set forth below, Plaintiff

27   sustained the following injuries and damages, past and future, among others:

28

a.   Wrongful death of JORDAN DEPPE, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

b.   Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

c.   Plaintiff's emotional distress [individual familial association claims];

d.   JORDAN DEPPE's hospital and medical expenses, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq.;

e.   JORDAN DEPPE's coroner's fees, funeral and burial expenses, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq.;

f.   Violation of JORDAN DEPPE's constitutional rights, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq. and federal civil rights law;

g.   JORDAN DEPPE's loss of life, pursuant to federal civil rights law;

h.   JORDAN DEPPE's conscious pain, suffering, and disfigurement, pursuant to federal civil rights law and Cal. Code of Civ. Proc. § 377.20 et. seq.;

i.   All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, and as otherwise allowed under California and United States statutes, codes, and common law.

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983)**
**PLAINTIFF AGAINST DEFENDANTS MAGRINI, RANDALL, PARSA, LEWIS,**
**PHINNEY, DELLWO, and DOES 1-20**

60.   Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

61.   By the actions and omissions described above, Defendants MAGRINI, RANDALL, PARSA, LEWIS, PHINNEY, DELLWO, and DOES 1-20, acting under the color of state law in their individual capacities, violated 42 U.S.C. § 1983, depriving Decedent JORDAN DEPPE, through Plaintiff herein, of the following clearly established and well-settled constitutional rights protected by the First, Fourth and Fourteenth Amendments to the United States Constitution:

      a.    The right to be free from deliberate indifference to JORDAN DEPPE's safety and serious medical and mental health needs while in custody as a pretrial detainee as secured by the Fourth and/or Fourteenth Amendments.

      b.    The right to be free from wrongful government interference with familial relationships and Plaintiff's right to companionship, society, and support, as secured by the First and Fourteenth Amendments.

62.     Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent and others would be violated by their acts and/or omissions.

63.     As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Decedent, through Plaintiff herein, sustained injuries and damages as set forth above at ¶ 59.

64.     The conduct of Defendants entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law.  Plaintiff does not seek punitive damages against Defendant SHASTA COUNTY.

65.     Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

**SECOND CAUSE OF ACTION**
**(*Monell* - 42 U.S.C. § 1983)**
**AGAINST DEFENDANTS SHASTA COUNTY and WELLPATH**

66.     Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

67.     The unconstitutional actions and/or omissions of Defendants PARSA, LEWIS, PHINNEY, DELLWO, and DOES 1-20, as well as other employees or officers employed by or acting on behalf of the Defendants COUNTY and/or WELLPATH, on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of Defendants COUNTY and/or WELLPATH, stated in the alternative, which were directed, encouraged, allowed, and/or

ratified by policymaking officers for Defendant COUNTY and its Sheriff's Office and/or Defendant WELLPATH, including SHERIFF-CORONER MAGRINI and JAIL CAPTAIN RANDALL:

    a.    To deny pretrial detainees and other inmates' access to timely, appropriate, competent, and necessary care for serious medical and psychiatric needs;

    b.    To allow and encourage inadequate and incompetent medical and mental health care for jail inmates and arrestees, including contracting for inadequate staffing;

    c.    To house seriously mentally ill patients at high risk of suicide in solitary confinement in segregated cells, and additionally allowing the covering of their cell windows with magnets which increases their isolation further, thereby increasing their risk of suicide;

    d.    To provide no treatment plan for severely mentally ill inmate-patients;

    e.    To fail to provide constant observation of acutely suicidal inmates, and fail to provide necessary and legally required documented observation of inmates, including inmates at risk of suicide or self-harm and/or inmates at risk of harm by others;

    f.    To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning handling mentally ill and/or emotionally disturbed persons or persons in medical crisis, or medical emergencies;

    g.    To fail to use appropriate and generally accepted law enforcement procedures for handling mentally ill and/or emotionally disturbed persons or persons in medical crisis;

    h.    To cover up violations of constitutional rights by any or all of the following:

        i.    By failing to properly investigate and/or evaluate incidents of violations of rights, including by unconstitutional medical and psychiatric care at the jail;

        ii.    By ignoring and/or failing to properly and adequately investigate and/or investigate and discipline unconstitutional or unlawful conduct by jail staff and WELLPATH employees; and

        iii.    By allowing, tolerating, and/or encouraging COUNTY and WELLPATH staff to: persistently refuse to provide victims' next of kin with any information about the victim's death; ignore repeated lawful requests for information; and/or obstruct or interfere with investigations of unconstitutional or unlawful conduct by withholding and/or concealing material information;

> j.  To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers, custodial officers, sheriff's office personnel, and WELLPATH staff at the jail whereby an officer or member of the sheriff's office, or WELLPATH staff does not provide adverse information against a fellow officer, or member of the SCSO, or WELLPATH staff;
>
> k.  To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (j) above, with deliberate indifference to the rights and safety of Decedent, Plaintiff and the public, and in the face of an obvious need for such policies, procedures, and training programs.

68.  Defendants COUNTY and WELLPATH, through their employees and agents, and through their policy-making supervisors, MAGRINI, RANDALL, and DOES 1-20, failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants PARSA, LEWIS, PHINNEY, DELLWO, DOES 1-20, and other COUNTY, and WELLPATH personnel, with deliberate indifference to Plaintiff's, Decedent's, and others' constitutional rights, which were thereby violated as described above.

69.  The unconstitutional actions and/or omissions of Defendants PARSA, LEWIS, PHINNEY, DELLWO, and DOES 1-20, and other Sheriff's Office personnel, as described above, were approved, tolerated, and/or ratified by policymaking officers for the COUNTY and its Sheriff's Office, including Defendants MAGRINI and RANDALL and by WELLPATH and WELLPATH's medical director.  Plaintiff is informed and believes and thereon alleges that the details of this incident have been revealed to the authorized policymakers within the COUNTY, the Shasta County Sheriff's Office, and WELLPATH, and that such policymakers have direct knowledge of the fact that the death of JORDAN DEPPE was the result of deliberate indifference to his serious medical and mental health needs.  Notwithstanding this knowledge, the authorized policymakers within the COUNTY including MAGRINI and RANDALL, its Sheriff's Office, and WELLPATH have approved of the conduct and decisions of Defendants PARSA, LEWIS, PHINNEY, DELLWO, and DOES 1-20 in this matter, and have made a deliberate choice to endorse

such conduct and decisions, and the basis for them, that resulted in the death of JORDAN DEPPE.

By so doing, the authorized policymakers within the COUNTY and its Sheriff's Office, and

WELLPATH have shown affirmative agreement with the individual Defendants' actions and have

ratified the unconstitutional acts of the individual Defendants.  Furthermore, Plaintiff is informed

and believes, and thereupon alleges, that Defendants MAGRINI, RANDALL and other policy-

making officers for the COUNTY and WELLPATH were and are aware of a pattern of misconduct

and injury caused by COUNTY law enforcement officers and WELLPATH employees similar to

the conduct of Defendants described herein, but failed to discipline culpable law enforcement

officers and employees and failed to institute new procedures and policy within the COUNTY and

WELLPATH.

70.     The aforementioned customs, policies, practices, and procedures; the failures to

properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and

discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful

conduct of Defendants COUNTY and WELLPATH were a moving force and/or a proximate cause

of the deprivations of Decedent's clearly established and well-settled constitutional rights in

violation of 42 U.S.C. § 1983, as more fully set forth above at ¶ 61.

71.     Defendants subjected Decedent to their wrongful conduct, depriving Decedent of

rights described herein, knowingly, maliciously, and with conscious and deliberate indifference for

whether the rights and safety of Decedent, Plaintiff and others would be violated by their acts and/or

omissions.

72.     As a direct and proximate result of the unconstitutional actions, omissions, customs,

policies, practices, and procedures of Defendants COUNTY and WELLPATH, as described above,

Decedent and Plaintiff suffered serious injuries and death, Plaintiff is entitled to damages, penalties,

costs, and attorneys' fees against Defendants COUNTY and WELLPATH as set forth above in ¶¶

63-65, including punitive damages against Defendant WELLPATH.

### THIRD CAUSE OF ACTION
**(Supervisory Liability - 42 U.S.C. § 1983)**
**AGAINST DEFENDANT MAGRINI, RANDALL, and DOES 1-20**

73.     Plaintiff realleges each and every paragraph in this complaint as if fully set forth

here.

74.     At all material times, Defendant MAGRINI, RANDALL, and DOES 1-20, had the

duty and responsibility to constitutionally hire, train, instruct, monitor, supervise, evaluate,

investigate, staff, and discipline the other Defendants employed by their respective agencies in this

matter, as well as all employees and agents of the Shasta County Sheriff's Office and WELLPATH.

75.     Defendants MAGRINI, RANDALL, and DOES 1-20 failed to properly hire, train,

instruct, monitor, supervise, evaluate, investigate, and discipline the respective employees of their

agencies, including Defendants PARSA, LEWIS, PHINNEY, DELLWO, and DOES 1-20, and

other COUNTY, Sheriff's Office, and WELLPATH personnel, with deliberate indifference to

Plaintiff's, Decedent's, and others' constitutional rights, which were thereby violated as described

above.

76.     As supervisors, Defendants MAGRINI, RANDALL, and DOES 1-20, each permitted

and failed to prevent the unconstitutional acts of other Defendants and individuals under their

supervision and control, and failed to properly supervise such individuals, with deliberate

indifference to the rights and serious medical needs of MR. DEPPE.  Based on the facts pled herein

including Defendants' supervisory responsibilities and practices, each of these supervising

Defendants either directed his or her subordinates in conduct that violated Decedent's rights, OR set

in motion a series of acts and omissions by his or her subordinates that the supervisor knew or

reasonably should have known would deprive Decedent of rights, OR knew his or her subordinates

were engaging in acts likely to deprive Decedent of rights and failed to act to prevent his or her subordinate from engaging in such conduct, OR disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate Decedent's rights, and in fact did cause the violation of Decedent's rights. Furthermore, each of these supervising Defendants is liable in their failures to intervene in their subordinates' apparent violations of Decedents' rights.

77. The unconstitutional customs, policies, practices, and/or procedures of Defendants COUNTY and WELLPATH, stated herein, were directed, encouraged, allowed, and/or ratified by policymaking officers for Defendant COUNTY and its Sheriff's Office, and Defendant WELLPATH, including Defendants MAGRINI, RANDALL, and DOES 1-20, respectively, with deliberate indifference to Plaintiff's, Decedent's, and others' constitutional rights, which were thereby violated as described above.

78. The unconstitutional actions and/or omissions of Defendants PARSA, LEWIS, PHINNEY, DELLWO, and DOES 1-20, and other Sheriff's Office, and WELLPATH personnel, as described above, were approved, tolerated, and/or ratified by policymaking officers for the COUNTY and its Sheriff's Office including Defendants MAGRINI, RANDALL, and by WELLPATH. Plaintiff is informed and believes and thereon alleges that the details of this incident have been revealed to Defendants MAGRINI and RANDALL, and that such Defendant-policymakers have direct knowledge of the fact that the death of JORDAN DEPPE was not justified or necessary, but represented deliberate indifference to his rights, safety, and serious mental health needs, as set forth in ¶¶ 61 and 69 above. Notwithstanding this knowledge, on information and belief, Defendants MAGRINI and RANDALL have approved and ratified the conduct and decisions of Defendants PARSA, LEWIS, PHINNEY, DELLWO, and DOES 1-20 in this matter, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, that

resulted in the death of JORDAN DEPPE.  By so doing, Defendants MAGRINI and RANDALL have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants.  Furthermore, Plaintiff is informed and believes, and thereupon alleges, that Defendants MAGRINI and RANDALL and other policy-making officers for the COUNTY and WELLPATH were and are aware of a pattern of misconduct and injury, and a code of silence, caused by COUNTY law enforcement officers and WELLPATH employees similar to the conduct of Defendants described herein, but failed to discipline culpable law enforcement officers and employees and failed to institute new procedures and policy within the COUNTY and WELLPATH.

79.     The aforementioned customs, policies, practices, and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants MAGRINI, RANDALL, and DOES 1-20 were a moving force and/or a proximate cause of the deprivations of Decedent's clearly established and well-settled constitutional rights in violation of 42 U.S.C. § 1983, as more fully set forth above at ¶ 61.

80.     Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent, Plaintiff and others would be violated by their acts and/or omissions.

81.     As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants MAGRINI, RANDALL, and DOES 1-20 as described above, Plaintiff sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorneys' fees as set forth above in ¶¶ 63-65.

**FOURTH CAUSE OF ACTION**
**(Violation of Civil Code § 52.1) – Survival Claim**
**AGAINST DEFENDANTS SHASTA COUNTY, WELLPATH, MAGRINI, RANDALL,**
**PARSA, LEWIS, PHINNEY, DELLWO, and DOES 1-20**

82.     Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

83.     By their acts, omissions, customs, and policies, DEFENDANTS COUNTY, WELLPATH, MAGRINI, RANDALL, PARSA, LEWIS, PHINNEY, DELLWO, and DOES 1-20, each Defendant acting in concert/conspiracy, as described above, while JORDAN DEPPE was in custody, and by threat, intimidation, and/or coercion, and with reckless disregard for his rights, interfered with, attempted to interfere with, and violated JORDAN DEPPE's rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution as follows:

a.     Decedent's right to be free from deliberate indifference to his safety and serious medical and mental health needs while in custody as a pretrial detainee as secured by the Fourteenth Amendment to the United States Constitution and by California Constitution, Article 1, § 7;

b.     Plaintiff's right to be free from wrongful government interference with familial relationships and Plaintiff's right to companionship, society, and support of each other, as secured by the First and Fourteenth Amendments;

d.     The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1;

e.     The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43; and

84.     Defendants' violations of Plaintiff's and Decedent's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.[4]  Alternatively,

---

[4] See *Atayde v. Napa State Hosp.*, No. 1:16-cv-00398-DAD-SAB, 2016 U.S. Dist. LEXIS 126639, at *23 (E.D. Cal. Sept. 16, 2016) (citing *M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013); see also, *Cornell v. City and County of San Francisco*, Nos. A141016, A142147, 2017 Cal. App. LEXIS 1011 at *58, f.n. 32 (Cal. Ct. App. Nov. 16, 2017) (approving *M.H., supra.*); *Reese v. County of Sacramento*, 888 F.3d 1030, 1043-44 (9th Cir. 2018) (following *Cornell*); *Rodriguez v. County of L.A.*, 891 F.3d 776, 799, 802 (9th Cir. 2018) (following *Cornell*).

separate from, and above and beyond, Defendants' attempted interference, interference with, and violation of JORDAN DEPPE's rights as described above, Defendants violated Decedent's rights by the following conduct constituting threat, intimidation, or coercion:

a. Intentionally and with deliberate indifference, depriving and/or preventing MR. DEPPE from receiving necessary, life-saving medical and/or psychiatric care and treatment;

b. Intentionally and with deliberate indifference, ordering and/or continuing MR. DEPPE's punitive housing in a segregated and/or disciplinary cell, under conditions of solitary confinement for long stretches of time, without necessary, life-saving medical and/or psychiatric care and treatment;

c. Intentionally and with deliberate indifference, causing MR. DEPPE to languish in jail without necessary medical/psychiatric/pharmacological care, or even the required treatment plan, when he was obviously unable to care for his own needs;

d. Subjecting MR. DEPPE to ongoing violations of his rights to prompt care for his serious medical and psychiatric needs over days, causing immense and needless suffering, intimidation, coercion, and endangering his life and well-being;

e. Requiring psychiatric patients at high risk of suicide to remain in jail without adequate supervision, competent mental health treatment, or any psychiatric treatment or treatment plan whatsoever, instead of allowing them to receive necessary medical and psychiatric care;

f. Deliberately causing the provision of inadequate and incompetent mental health care to Shasta County jail detainees and inmates, including contracting for inadequate care;

g. Choosing not to provide any cells in the entire 9-storey jail where inmates at risk of suicide can receive constant observation, and choosing not to provide the required constant observation for inmates at high risk of suicide who are housed in segregated cells;

h. Housing severely mentally ill inmates, who are receiving no psychiatric care and are at high risk of suicide, in segregated cells;

i. Failing to transfer severely mentally ill patients who are refusing or "cheeking" prescribed and necessary psychiatric medication to a hospital or locked psychiatric facility where they can receive necessary care and medication;

j.   Instituting and maintaining the unconstitutional customs, policies, and practices described herein, when it was obvious that in doing so, individuals such as MR. DEPPE would be subjected to threat, intimidation, or coercion, and ongoing violations of rights;

k.   Intentionally and with deliberate indifference, doing and/or permitting subparagraphs (a) – (j) when it was also obvious that in doing so, Decedent was at grave risk of suicide, and Plaintiff's rights as Decedent's father also would be violated.

85.   The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of Decedent's rights, or to any legitimate and lawful jail or law enforcement activity.

86.   Further, all of Defendants' violations of duties and rights, and coercive conduct, described herein were volitional acts; none was accidental or merely negligent.

87.   Further, each Defendant violated Plaintiff's and Decedent's rights by their reckless disregard and with the specific intent and purpose to deprive them of their enjoyment of those rights and of the interests protected by those rights.

88.   Defendants COUNTY and WELLPATH are vicariously liable for the violation of rights by their employees and agents.

89.   As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Decedent's rights under the United States and California Constitutions, Plaintiff (as Successor in Interest for Decedent) sustained injuries and damages, and against each and every Defendant is entitled to relief as set forth above at ¶¶ 63-65, including punitive damages against all individual Defendants and WELLPATH, and all damages allowed by California Civil Code §§ 52 and 52.1 and California law, not limited to costs attorneys' fees, and civil penalties.

**FIFTH CAUSE OF ACTION**
**(VIOLATION OF ADA (Title II) and REHABILITATION ACT)**
**(42 U.S.C. § 12132 & 29 U.S.C. § 794)**
**PLAINTIFF AGAINST DEFENDANT SHASTA COUNTY**

90.     Plaintiff re-alleges and incorporates by reference the allegations contained in this complaint, as though fully set forth herein.

91.     Title II of the ADA prohibits discrimination on the basis of disability by public entities, which the Act broadly defines as "any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]"  42 U.S.C. § 12131(1)(B).  Similarly, §504 of the Rehabilitation Act of 1973 proscribes discrimination by "any program or activity[,]" 29 U.S.C. § 794(a), defined as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b).  Defendant SHASTA COUNTY is a covered entity for purposes of enforcement of the ADA, 42 U.S.C. §12181(7)(F), and the Rehabilitation Act, 29 U.S.C. § 794, pursuant to the regulations promulgated under each of these laws.  Further, on information and belief, Defendant COUNTY receives federal assistance and funds.  Defendant COUNTY is also within the mandate of the RA that no person with a disability may be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794.

92.     Congress enacted the ADA upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101 (a)(2).

93.     Title II of the ADA provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Discrimination under the ADA and RA includes not only, *e.g.*, a denial of benefits and services, but also a failure to provide a reasonable accommodation (also known as reasonable modification) for an individual's disability.

94.     Defendant COUNTY is further mandated under the ADA not to utilize standards or

criteria or methods of administration that have the effect of discriminating on the basis of disability. 42 U.S.C. § 12182(b)(1)(D)(i).  Discrimination includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities."  42 U.S.C. § 12182(b)(2)(A)(ii).

95.    At all material times, including, but not limited to prior to – and between – December 21, 2020 and January 7, 2021, MR. DEPPE was a "qualified individual" with a mental illness and disability and impairments that limited and/or substantially limited multiple major life activities such as working, living on his own, providing for his basic needs, and being able to care for himself and control his mental, medical, or physical health condition as defined under the ADA, 42 U.S.C. § 12131 (2), and under Section 504 of the Rehabilitation Act ("RA") of 1973, 29 U.S.C. § 794, 28 C.F.R. 42.540 (k); as such, MR. DEPPE qualified as an individual with a disability under California and federal law and MR. DEPPE met the essential eligibility requirements of COUNTY programs to provide access to medical and mental health care services for its detainee/inmate patients in COUNTY's jails while they are in custody.  Through its employees and agents, Defendant COUNTY had knowledge of MR. DEPPE's obvious disability.

96.    As a "qualified [disabled] individual," Defendant COUNTY was required to make reasonable accommodations for MR. DEPPE's disability and provide access to psychiatric care and other appropriate services while he was in custody as an inmate, and provide constant observation and suicide-resistant housing, bedding, and clothing, to protect him from suicide or self-harm.  MR. DEPPE's status as a qualified disabled person also required Defendant COUNTY not to engage in discrimination based on disparate treatment or impact to disabled persons like MR. DEPPE.

97.    Defendant COUNTY discriminated against MR. DEPPE by failing to place him in a setting, and/or failing to provide appropriate services, to reasonably accommodate his disability and treatment needs.  Defendant COUNTY also discriminated against MR. DEPPE by failing to place him in a setting, and/or failing to provide appropriate services and accommodations, to allow him to enjoy the same jail services available to inmates not disabled by mental illness, including but not

limited to safe settings and physical spaces, non-segregated housing, access to group interactions, and ability to meaningfully participate in his own criminal defense.  Defendants' failure to reasonably accommodate MR. DEPPE's obvious disability in the course of his incarceration caused him to suffer greater injury and indignity in that process than other non-disabled inmates.

98.     Because of the aforementioned acts and omissions of the individual Defendants and others, working as employees and/or agents of Defendant COUNTY, Defendant COUNTY violated the ADA, RA, and further discriminated against MR. DEPPE, violating his ADA, RA, and state protected rights by: (a) failing to provide services or accommodate MR. DEPPE as indicated and with appropriate classification, housing, and monitoring for a person in their sole and exclusive custody whom they knew was mentally disabled, acutely suicidal, and at very high risk of suicide; (b) failing to provide reasonable accommodations to people in custody with mental disabilities at their hospitals, clinics, inpatient psychiatric facilities, and jails and, instead, providing a quality of care and service that is different, separate, inferior, and worse than the service provided to other individuals with the same disabilities; (c) denying MR. DEPPE, a qualified individual with a disability, the opportunity to participate in or benefit from the aid, benefit, or services of the COUNTY, in violation of 28 C.F.R. § 35.130(b)(1)(i); (d) by reason of MR. DEPPE's mental disabilities, Defendants did not afford MR. DEPPE an opportunity to participate in or benefit from the aid, benefits, and services that are equal to those afforded to other, non-disabled individuals by Defendants, in violation of 28 C.F.R. § 35.130(b)(1)(ii); (e) on the basis of MR. DEPPE's disability, the named Defendants failed to provide MR. DEPPE an aid, benefit, or service that was as effective in affording equal opportunity to obtain the same result, to gain the same benefit, and to reach the same level of achievement as provided to other individuals in the same situation, in violation of 28 C.F.R. §35.130(b)(1)(iii); (f) limited MR. DEPPE, a qualified individual with a disability, in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving the aid, benefit, or service of which MR. DEPPE was denied, in violation of 28 C.F.R. §35.130(b)(1)(vii).

99.     Defendant COUNTY, through its employees and agents, acted as described in this Complaint despite knowing, at all relevant times, that MR. DEPPE was a qualified individual under

the ADA and RA with an obvious mental disability that greatly increased his risk of suicide.

100.     Further, all of Defendant COUNTY's actions, choices, and decisions were policies or procedures, or a product thereof, instituted by Defendant COUNTY that had a disparate impact on MR. DEPPE due to his disability, in violation of his rights under the ADA and RA.

101.     Thus, due to Defendant COUNTY's failure to reasonably accommodate MR. DEPPE's disability, and Defendant COUNTY's conduct and decisions that had a disparate impact on him and other similarly disabled individuals, causing MR. DEPPE to suffer greater injury and indignity than other non-disabled inmates, Defendant COUNTY effectively treated non-disabled inmates more favorably than individuals with MR. DEPPE's disability and high risk of suicide.

102.     As a result of the acts and misconduct of Defendant COUNTY complained of herein, MR. DEPPE committed suicide, and Plaintiff has suffered, is now suffering, and will continue to suffer damages and injuries as alleged above.  Plaintiff sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorneys' fees as set forth above, in ¶¶ 63-65.  Plaintiff does not seek punitive damages against Defendant COUNTY.

**SIXTH CAUSE OF ACTION**
**(Negligence)**
**<u>AGAINST COUNTY, MAGRINI, RANDALL, and DOES 1-20</u>**

103.     Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

104.     At all times, Defendants COUNTY, MAGRINI, RANDALL, and DOES 1-20, owed Plaintiff and Decedent the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

105.     At all times, these Defendants owed Plaintiff and Decedent the duty to act with reasonable care.

106.     These general duties of reasonable care and due care owed to Plaintiff and Decedent by these Defendants include but are not limited to the following specific obligations:

a. To provide safe and appropriate jail custody for JORDAN DEPPE, including reasonable classification, monitoring, and housing, including placing him on suicide watch with proper suicide precautions, providing him with constant observation, documenting his condition during less frequent observations, and preventing access to physical conditions and items that could foreseeably be used for suicide;

b. To summon necessary and appropriate medical care for MR. DEPPE;

c. To use generally accepted law enforcement and jail procedures that are reasonable and appropriate for Decedent's status as a mentally ill and/or emotionally disturbed person;

d. To ensure that inmate-patients who are at risk of suicide receive appropriate mental health care, monitoring, and supervision;

f. To ensure that all mentally ill patients receive a treatment plan, appropriate evaluation by a psychiatrist, and continuity of care, including contracting for appropriate staffing for mental healthcare providers;

g. To ensure that inmates at high risk of suicide are not housed alone in solitary confinement, or when housing such inmates alone, to ensure they are placed on constant observation;

h. To ensure that any private medical contactor(s) to whom they attempt to delegate responsibility for inmates' medical and psychiatric care actually provide (1) the level of care required by contract, and (2) a constitutional and lawful level of care;

i. To refrain from abusing their authority granted them by law;

j. To refrain from violating Plaintiff's rights as guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

107. Defendants COUNTY, MAGRINI, RANDALL, and DOES 1-20, through their acts and omissions, breached each and every one of the aforementioned duties owed to Plaintiff and Decedent.

108. Defendant COUNTY is vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code section 815.2.

109.    As a direct and proximate result of these Defendants' negligence, Plaintiff and Decedent sustained injuries and damages, and against each and every Defendant named in this cause of action in their individual capacities are entitled to relief as set forth above at ¶¶ 63-65, including punitive damages against such individual Defendants.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests the following relief against each and every Defendant herein, jointly and severally:

a.    Declaratory relief, finding that Defendants violated Plaintiff's and Decedent's rights, to serve the purposes of 42 U.S.C. § 1983, 42 U.S.C. § 12132, 29 U.S.C. § 794, and Cal. Civil Code §§ 52 and 52.1, including for vindication of those rights as "Private Attorneys' General," elucidation of those rights for the courts, the public, and government officials, and to deter similar wronging by the Defendants and other officials;

b.    Compensatory and exemplary damages in an amount according to proof and which is fair, just, and reasonable;

c.    Punitive damages under 42 U.S.C. § 1983 and California law in an amount according to proof and which is fair, just, and reasonable (Plaintiff does not seek punitive damages against the COUNTY);

d.    All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 et seq., 52.1; and as otherwise may be allowed by California and/or federal law;

e.    Declaratory and injunctive relief, including but not limited to the following:

    i.    An order requiring Defendants to institute and enforce appropriate and lawful training, supervision, policies, and procedures for handling mentally ill and/or emotionally disturbed persons, and/or persons with serious medical and mental health needs at COUNTY's jails;

    ii.    An order requiring Defendants to provide inmates at COUNTY's jail access to appropriate, competent, and necessary care for serious medical and psychiatric needs;

    iii.    An order requiring Defendants to properly classify, house, and/or monitor inmates suffering from mental health disabilities, including placement on suicide watch with proper suicide precautions;

iv.   An order requiring Defendants to provide constant observation for all acutely suicidal inmates, as well as all non-acutely suicidal inmates housed alone in segregated cells;

v.   An order requiring Defendants to create and follow treatment plans for all mentally ill inmates; and

vi.   An order requiring Defendants to require staff to document the inmate's condition during required observations and welfare checks of inmates.

f.   Such further relief, according to proof, that this Court deems appropriate and lawful.

## **JURY DEMAND**

Plaintiff hereby demands a jury trial in this action.

Dated:  January 28, 2022       HADDAD & SHERWIN LLP

*/s/ Julia Sherwin*
_____
JULIA SHERWIN
Attorneys for Plaintiff